PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al. FARMERS' LOAN & TRUST CO. v. METROPOLITAN ST. RY. CO. et al. GUARANTY TRUST CO. OF NEW YORK v. METROPOLITAN ST. RY. CO. et al.

(District Court, S. D. New York. April 8, 1912.)

Nos. 2–29, 2–133, 2–149, and 3–37.

1. STREET RAILROADS (§ 58*)—RECEIVERS—SETTLEMENT OF SUITS BY APPORTIONMENT OF PROCEEDS.

An action at law was brought by the receiver of a street railroad against a corporation, which resulted in a judgment, affirmed on appeal, and on which a certain sum was collected from security given on the appeal. Ancillary proceedings were then instituted against stockholders of the defendant, which was insolvent. The receiver also brought a suit in equity on different claims against the same corporation and others. Pending such suit and the ancillary proceedings, a settlement was made by which the receiver was paid a lump sum in full satisfaction of both causes of action without any agreement as to its apportionment between them. *Held*, that in the absence of persuasive proof of equities requiring a different application, and in view of the uncertainty of recovery and collection in either case, the sum should be apportioned ratably between them, taking the amount due on the judgment, after crediting the sum collected, with interest to the date of settlement, and the amount of the claim involved in the equity suit with interest to the same date.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

2. STREET RAILROADS (§ 58*)—LEASE—CONTRACTS FOR IMPROVEMENTS—EFFECT OF INSOLVENCY.

The basis of distribution determined between lessor and lessee street railroad companies of a fund received in settlement of a suit by the receivers of the lessee company, arising out of contracts between the two companies, and between them and other corporations under which the money was to be paid to the lessee, and by it expended in making improvements on the leased property, to be ultimately paid for by the lessor.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Pennsylvania Steel Company and another against the New York City Railway Company and another; the Farmers' Loan & Trust Company against the Metropolitan Street Railway Company and others; the Guaranty Trust Company of New York against the Metropolitan Street Railway Company and others; and one other cause. On exceptions to report of special master in the matter of application of Adrian H. Joline and Douglas Robinson, receivers of the Metropolitan Street Railway Company, for apportionment of proceeds of the action at law, brought by William W. Ladd, as receiver of the New York City Railway Company against the Metropolitan Securities Company. Modified and confirmed.

This cause comes here upon exceptions to a report of the special master upon certain matters arising in the progress of the receivership of the two defendant corporations, and which present questions that must be disposed of before the final accounting of the respective receivers can be proceeded with. The particular matter is the disposition of the money and securities received by the receiver of the New York City Railway Company in settlement of the action at law and the suit in equity, which had been brought by him and the proposed compromise of which was approved by this court in the memorandum, filed July 8, 1910 (C. C.) 180 Fed. 514.

The following is the report of the special master, filed December 11, 1911:

The first question asked by the court is: In what proportion shall the net proceeds of the settlement of the action at law brought by the receiver of the New York City Railway Company against the Metropolitan Securities Company and the suit in equity brought by him against the same company and its directors be apportioned between the said action at law and the said suit in equity?

The order of the court approving the settlement and authorizing the city receiver to execute and deliver a satisfaction of the judgment in the action at law and a consent to discontinue the suit in equity against all defendants upon payment to him of $5,500,000 was entered on July 8, 1910. The letter of June 29, 1910, from his counsel to the receiver which was before the court as part of the petition on which this order was based, states the amounts due on judgment and claim in equity as of June 1, 1910, to have been as follows:

Amount of judgment entered February 11, 1909...............$5,271,582 54
Received on account through cash security on appeal.......... 1,031,738 86

Balance due on principal of said judgment..................$4,239,843 68
Interest to June 1, 1910......................................... 365,146 06

    Total of judgment and interest to June 1, 1910...........$4,604,989 74

The amount involved in the undecided suit as of the same date is stated as follows:

Amount claimed without interest.............................$2,797,200 00
Interest to June 1, 1910....................................... 1,213,365 50

    Total with interest to June 1, 1910......................$4,010,565 50

The amount of cash received as security on appeal does not include the value of certain other property also received for the same purpose prior to the settlement. Its suggested value is upwards of $100,000, but, whatever it may be, it, of course, goes in further reduction of the amount due on the

judgment as of the date of settlement. These amounts due on judgment and claim are increased by the interest due from the date to which it is calculated (June 1. 1910) to the date of settlement, and that interest in the case of the judgment is $26,852.84 and of the claim $17,715.60, making the total amount due on the latter on the date in question $4,028,281.10 and on the former $4,631,842.68, subject to the further reduction noted.

The terms upon which the settlement was effected are embodied in the letter of counsel for the defendants accepted in the letter of the receiver, and approved by the court, and those terms are absolutely silent as to the appropriation of any portion of the proceeds of settlement to either the judgment or the claim. More than this, it appears from the testimony of the city receiver before me that not only was a specific proposition of apportionment advanced on behalf of the defendants rejected definitely and at all times, but that a statement was made to counsel conducting negotiations for them that no settlement would be considered which involved any apportionment whatever of the proceeds between these two suits. It is, nevertheless, contended by the petitioners and the replicant Trust Company on the one hand that so much of the proceeds as is necessary to satisfy the amount remaining due on the judgment on July 8, 1910, shall be apportioned to it leaving the balance to be applied on the claim in equity and by the other replicants on the other hand that the latter claim is first to be satisfied in full. In support of each of these diametrically opposite contentions all the arguments suggested by the facts growing out of the extremely complicated relations of the railway companies, the Securities Company and the Interborough Metropolitan Company, and by the various legal proceedings instituted to collect the judgment are marshaled. They have been carefully considered, but to my mind they only emphasize the wisdom of the receiver in refusing to consider any apportionment whatever, and illustrate the justice of applying the rule of appropriating the payment ratably to the claims to which it related. Gillett v. Gillett, 48 App. Div. 388, 63 N. Y. Supp. 49; Dows v. Ekstrone (C. C.) 3 Fed. 19. Arguments based upon the probability or improbability of collecting the judgment through the judgment creditors' suit, or the suit in equity for the unpaid balance of stock subscription, and upon the probability or improbability of ultimate and complete success in the equity suit against the Securities Company and the individual defendants, or upon its undoubted and perhaps controlling influence in forcing this payment, as well as inferences from the facts that the individual defendants paid $1,500,000 for themselves and loaned $4,000,000 to the Interborough Metropolitan with which to complete the payment made in settlement of both claims were present in the minds of the parties to the settlement and of their counsel and they pointed clearly to the difficulty and unfairness of attributing a portion of the proceeds to either claim in full or of determining upon an amount to be assigned to each. This difficulty and unfairness confront the court now as they did the parties then, and indicate the justice of a ratable apportionment. I shall accordingly report to the court the following answer to its first question:

The net proceeds of the settlement of the action at law brought by the receiver of the New York City Railway Company against the Metropolitan Securities Company and the suit in equity brought by him against the same company and its directors should be so apportioned that of said net proceeds there be applied to said action at law such a proportion as the amount due on the judgment in the action at law as and of July 8, 1910, the date of settlement, being the difference between the face of said judgment with interest to said date and the cash and the value of other property received on account as security on appeal, bears to the total of said amount plus the amount then due, including interest on the claim in the suit in equity, and that there be applied to said suit in equity the remainder of said net proceeds.

The second question is: To what part, if any, of the proceeds of said action at law are the Metropolitan Street Railway Company or its receivers entitled?

The answer to this question depends upon the construction to be placed upon the four agreements of May 22, 1907, entered into shortly before the receivership of the street railway companies between them and the Metropolitan Securities and Interborough-Metropolitan Companies and Mercantile

Trust Company, which in certain of their aspects have already been passed upon by this court and the Circuit Court of Appeal in the action at law. At the time they were executed, certain provisions of the lease between the Metropolitan and City Companies were in force which the court in that action has said they were intended to effectuate. Those provisions are contained in article 15 of that document, which after prohibiting, without the consent of the City Company (lessee), any increase of the Metropolitan's funded debt or that of its subsidiaries by the lessor or the creation of, or permission to create such a debt by lessee, except as herein provided, refers to a fund of $23,-000,000 by a prior article (12) required to be "furnished" by the lessee to lessor for the purpose of paying the unfunded debt of the lessor, and providing for expenditures for improving, extending, and equipping the lines of railroad and other property of the lessor and subsidiary companies (capital expenditures), and states that "if after expenditures of such part of said sum of $23,000,000 as shall be available for additional equipment, improvements, and extensions it shall be expedient to extend the lines of railroad hereby demised, or to provide any additional and increased equipment for or make any change of motive power upon, or any radical change in the construction, location or character of, any such lines," then, either after agreement between the parties as to the nature of the expenditures and their amount or after the determination by arbitration as to such nature or amount, "the lessee shall provide the moneys required for the capital expenditures so agreed upon or determined and the lessor shall issue to the lessee therefor such securities, whether stocks, bonds or other obligations as shall have been fixed by such agreement or arbitration and at the price and upon the terms so fixed." On May 22, 1907, the whole of this $23,000,000 had been "furnished" by the lessee and the whole of that portion of it available for capital expenditures had been expended, and, in addition, a sum in contemplation at the time and later definitely ascertained and admitted to be $2,-824,483.81 for similar purposes, and still further advances for such purposes as well as to provide for certain other indebtedness were yet to be made. Accordingly lessor and lessee entered into what is the first of the May agreements here involved which after reciting those provisions of the lease above summarized contains the following relevant recital and covenants: "Whereas, the $23,000,000 so to be paid under said leases has been paid by the City Company to the Metropolitan Company, and no part thereof is available for additional equipment, improvements and extensions, and *certain other advances have been made and are to be made to or for the Metropolitan Company for which and to provide for certain other indebtedness*, the Metropolitan Company is likewise obligated to issue its securities under the terms of the lease above described. * * * Now, therefore, in consideration of the premises and the mutual covenants of the parties, it is agreed: (I) The City Company shall as and when required, and in any event, before Jan. 1, 1909, furnish the Metropolitan Company eight million dollars in cash. (II) The Metropolitan Company shall forthwith issue and deliver to the Metropolitan Securities Company or its order its three-year five per cent. improvement notes to the face amount of $8,000,000."

The agreement further provides for the description of the notes, that they shall be payable "to the Mercantile Trust Company or bearer as the City Company may require," and that there may be substituted therefor Metropolitan "collateral improvement notes" of the same terms and amounts secured by certain specified collateral. By paragraph 3 of this agreement specific authority is given to the Securities Company to hypothecate said improvement and collateral notes, and to allow hypothecation thereof for obligations of the Interborough Metropolitan Company issued for the purpose of raising moneys to be advanced to said Securities Company, hypothecation by the Interborough to be in amounts and on terms in its discretion.

For the purpose of securing the eight millions that it thus agreed to furnish the Metropolitan Company in cash, the City Company then entered into an agreement with the Securities Company which contains the following relevant recitals and covenants: "The City Company has entered into an agreement of even date with the Metropolitan Street Railway Company (a copy of which is hereto attached), under which the Metropolitan Street Railway Com-

pany has, at the request of the City Company, delivered, or is about to deliver, to the Securities Company its three-year five per cent. improvement notes to the face amount of $8,000,000 as in said agreement described: Now therefore, in consideration of the premises and the mutual covenants of the parties hereto, it is agreed: (II) The Securities Company shall as and when required on reasonable notice and in any event before Jan. 1, 1909, furnish to the City Company such sums as may be required by it to carry out the attached agreement by it with the Metropolitan Street Railway Company. (IV) The amount of interest on the Improvement notes of the Metropolitan Company issued and delivered to the Securities Company shall be adjusted on each half yearly interest day on the basis of such amounts as may from time to time have been advanced hereunder to the City Company for the fulfillment of its obligations to the Metropolitan Company under the annexed agreement between said companies."

On the same day the Securities Company and the Interborough Metropolitan entered into a contract reciting the latter's ownership of more than 92 per cent. of the stock of the Securities Company, the contracts above referred to which were annexed, and the delivery of the notes for $8,000,000. The relevant undertakings of the contract may be summarized to be that the Interborough Company should provide and from time to time before July 1, 1909, advance to the Securities Company $15,000,000 in such amounts as it should require, and that the latter should deliver to the former its demand notes for $15,000,000 of a tenor stated and as security therefor with shares of stock identified in the agreements, the $8,000,000 Metropolitan Improvement notes in these agreements described, and such other notes and obligations as might be obtained under the agreements so annexed with full power to the Interborough of rehypothecation as security for its own notes for the purpose of raising funds to be advanced to the Securities Company thereunder.

The agreement between the Interborough and the Mercantile Trust Company was a trust agreement defining the terms upon which was to be held the security consisting of the shares of stock and the improvement notes or such of them as might be deposited with the trustee thereunder for an issue of $15,000,000 of three-year collateral trust 5 per cent. Interborough notes.

What was done under these agreements prior to the receiverships may be briefly indicated. The Interborough Company delivered to the Trust Company all the shares of stock, but only $4,000,000 of the $8,000,000 of Metropolitan Improvement notes, all of which had been turned over by the Metropolitan through the Securities Company to it. On an equivalent amount of its three-year collateral trust notes it obtained $8,050,000 which with $450,000 of its own cash, making $8,500,000 in all, it paid to the Securities Company. Of this amount the latter company paid to the City Company $2,700,000 by checks and $336,000 by delivering to it three notes of $500,000 each, or $1,500,000 in all, of the Metropolitan which it had received from the Interborough in part payment of said $8,500,000; said three notes being delivered in exchange for a note for $1,164,000 of the Security Company held by the Metropolitan and by it surrendered to the City Company for that purpose, the difference being treated by all the parties concerned as a payment by the Securities Company to the City Company and by the latter to the Metropolitan Company under these contracts. The total payment was therefore $3,036,000, leaving due the balance of the $8,000,000 claimed in the action at law of $4,964,000, being the amount of the judgment exclusive of the interest allowed by it to the date of its entry.

One other transaction prior to the appointment of receivers of the Metropolitan on October 1, 1907, but subsequent to the appointment of the City receivers on September 25, 1907, remains to be indicated, as the disposition which the court made of it has an important bearing on the main contention urged by the petitioners in support of their claim to substantially all of the fund apportioned to the action at law. It is the transaction involved in the repayment without the consent of the receivers of the City Company of $500,000 loaned to the Securities Company and $300,000 loaned to the City Company out of the Central Crosstown Construction fund of $814,931.12 originally held by the Metropolitan as a trust fund under article 12 of the Central Crosstown lease to it. This $800,000 thus loaned the Securities Company paid back

by check to the Metropolitan Company dated September 25, 1907, either on that date or on October 1st following. It was among the items of indebtedness referred to in the recital above quoted in the contract between the Metropolitan and City Companies which the contract itself was clearly in part made to meet, and the defendant Securities Company insisted that it should be allowed as a payment to the Metropolitan in deduction of the amount claimed in the action at law. The court held, however, and in its holding was followed on the appeal, that it was a payment intentionally made without consulting the receivers of the City Company, and for that reason refused to allow it as a credit. This is a ruling as to an issue involved in the action which is controlling here, and it means that the City Company under these contracts did have a beneficial interest in the moneys to be furnished by the Securities Company.

The petitioners nevertheless insist that the Metropolitan Company is under the contracts the sole beneficial owner of the proceeds of the action at law. This contention they base on certain expressions contained in 'the opinion of the Court of Appeals which they extend, as it seems to me, beyond anything which that opinion justifies. Thus it is stated in their brief, and the statement is italicized, that "to use the language of the Court of Appeals in the action at law the Securities Company and the City Company are merely 'conduits' for the passage of the money from the Interborough Company to the Metropolitan Company." What the opinion says is that "the Metropolitan Securities Company was nothing but an agent or conduit for the delivery 'of the notes and securities from the Metropolitan Street Railway Company to the Interborough Metropolitan Company and the transmission of the money received *to the New York City Company.*" This, with all other expressions in the opinion upon which reliance in support of the contention, is based was said arguendo in support of the court's conclusion that the obligation of the Securities Company was absolute, and that it was not an agreement to loan, and this was really the sole defense to the action, and the one question upon which the Court of Appeals passed, and upon which it was necessary to pass. It did not undertake to define the relative rights and obligations of the Metropolitan and City Companies as to this fund when it reached the City Company, and if it be read in conjunction with that of the Circuit Court which, except as to the delivery of the improvement notes to the Securities Company constituting a sale, it expressly adopts, the conclusion is irresistible that, so far from being a mere conduit for the transmission of .the $8,000,000 without beneficial interest therein, the City Company was regarded as even more vitally interested in those millions than the Metropolitan itself. The disposition made above and below of the defendant's claim to a credit for the Central Crosstown payment described shows this, and, if more be needed, it will be found in the ruling of Judge Ward on defendant's claim that, in any event, it was not bound to loan or pay a definite sum, but only such sums as might be required by the City Company to fulfill its contract with the Metropolitan, and that, as plaintiff had shown up to the receivership expenditures before and after the contract of not more than $3,036,000 which had been paid, it was entitled to receive nothing. That ruling is that the language of the Securities-City contract that the amount to be furnished was such sum as might be required to carry out the City-Metropolitan agreement were words of description, and not of condition; that it was a way of saying that the Securities Company was to pay $8,000,000 and had nothing to do with the application of the money; and that even after the receivership the plaintiffs as receivers of the City Company could call for the money and apply it in accordance with the lease to capital expenditures upon Metropolitan property. The contention is opposed to the language of the lease which these May contracts were intended to effectuate, to the long continued and settled practice of the parties under the lease which was for the lessee to make the expenditures agreed upon for capital account itself, charging them against the Metropolitan Company and looking to reimbursement from the proceeds of the securities furnished by the latter, and to the definite undertaking of the City Company to furnish the sum in question for purposes specified absolutely and in any event.

But, if this much seems clear, it is equally clear that the contention of the city receiver and of the creditors contract and tort that the relation between

the two street railway companies created by these contracts was that of simple debtor and creditor cannot be accepted. I concede that if only the promise of the City Company contained in its contract with the Metropolitan to furnish it as and when required, on reasonable notice, and in any event before January 1, 1910, $8,000,000 in cash, be considered, only the relation of debtor and creditor results, but that promise must be construed in the light of the recital which it contains and the contract containing it, with the others in pari materia, for the purpose of discovering and effectuating the intention of the parties as disclosed by all of these agreements, and these, as thus construed in the action at law, define the sources from which the moneys should come, while the contract in question defines the purposes for which they should be used. Thus the recital referred to after stating the expenditure of the $23,000,000 provided for in the lease, and that no part thereof is available for additional equipment, improvements, and extensions, says that certain other advances (i. e., for such capital expenditures) have been made, and are to be made, to or for the Metropolitan Company for which and to provide for certain other indebtedness the latter is obligated to issue its securities under the terms of the lease, and it is for these and not for general purposes that promises to "furnish" the cash and to deliver the notes are given. The City's promise, qualified by the recital, thus becomes a promise to "furnish to or for" the Metropolitan this cash for capital expenditures then already made in excess of the $23,000,000 as well as then in contemplation and for the payment of the other indebtedness then existing and capable of precise ascertainment. The recital, though not as matter of law strictly a part of the contract (Burr v. Butt Co., 81 N. Y. 178), does where the intent is plain, as it certainly is here, control the obligation and prevent an operation more extensive than that which it permits (National Mechanics' Banking Ass'n T. v. Conkling, 90 N. Y. 116, 42 Am. Rep. 405, note). It will be noted that the promise thus construed in connection with the recital accurately summarizes the obligations of the parties in respect to the capital improvements under the lease, and recognizes the practice that had existed in pursuance of which the City Company "furnished" the cash "to or for" the Metropolitan Company by itself making and paying for the improvements when their nature and amount had been agreed upon, and charging the payments to the latter against the agreed price of its securities from the proceeds of the sale of which reimbursement came.

It is urged further, however, that the promise must be to pay from the particular fund which the promisor has received for that purpose. This the promise of the city to the Metropolitan Company as expressed does not, of course, do, but I do not understand it to be necessary that it should provided the City Company by these contracts accepts a fund which is intended to enable it to fulfill its promise to furnish funds for purposes specified. McKee v. Lamon, 159 U. S. 317, 16 Sup. Ct. 11, 40 L. Ed. 165; Van Alen v. American National Bank, 52 N. Y. 1. In the latter case the defendant bank made no promise to pay the person beneficially entitled, and did not have knowledge of the transaction, but, as its depositor had accepted a fund for the purpose of paying such person and that fund was traceable in the depositor's balance and susceptible of clear identification, it was held that the bank could be compelled to pay it to this particular creditor of its depositor. Here the City Company accepts a fund from the Securities Company which the latter agrees to furnish to the City Company to carry out its attached agreement with the Metropolitan as the second and fourth articles of the Securities-City agreement show. This limits its application to the purposes intended, and this court in construing the words of the contract in relation to their bearing on the extent of the liability incurred by the Securities Company has not in my judgment said that it does not.

The purposes recited for which the fund was intended are indicated in detail in the resolution passed at the directors' meeting of the Metropolitan Company on May 22, 1907, at which the City-Metropolitan contract was authorized. The relevant portions I quote verbatim:

"(b) The Metropolitan Street Railway Company then acknowledges itself indebted to the New York City Company for $2,834,483.81 (corrected amount) being amounts advanced or due to pay for construction work of the Metro-

politan Street Railway Company or its subsidiary companies in excess of the $23,000,000 for which amount the New York City Company is, under the terms of the lease, entitled to obligations of the Street Railway Company.

"The Metropolitan Street Railway Company has no indebtedness for which the New York City Railway Company is responsible.

"(c) The Metropolitan Street Railway Company at the close of this settlement will then have the following indebtedness:

New York City Railway Company (corrected)................$2,834,483 81
Notes payable ..........................................2,003,833 00
Accounts payable (including estimated franchise taxes)........   778,939 00
                                                            _____
                                                            $5,617,255 81

Less
Due from Metropolitan Securities Co. on account
    of loan .................................$1,164,000
Cash ........................................    6,704
Accounts receivable..........................   61,293
                                                            _____
                                                            $1,231,997 00
                                                            _____
                                                            $4,385,258 81

For all of that amount, plus the amount of contemplated construction, it must arrange some method of financing provided by the New York City Railway Company, and it is proposed to issue its improvement notes to the total amount of $8,000,000. The contemplated new construction approved by the New York City Company will amount to more than $4,000,000 by January 1, 1909.

The contemplated construction is indicated in the minutes of a meeting of the directors of the Metropolitan Company held June 4, 1907, and stated to be the cost of preparing Twenty-Eighth and Twenty-Ninth street line and First Avenue line for electric car operation fixed in round figures at $4,000,-000.

The balance of indebtedness above indicated which the $8,000,000 was in part intended to meet had, at the date of the receivership, been reduced by payments from the Securities Company of $2,700,000 in checks and $336,000 in offsets of credits applicable to the item of notes payable by the Metropolitan above mentioned the $2,700,000 being retained by the City Company as payment on account of the indebtedness mentioned due it of $2,834,483.81.

This last item had thus been reduced to $134,483.81, and with two payments of $50,000 each to the Yonkers Railway for construction not originally intended to be paid out of this $8,000,000, but which by agreement between lessor and lessee, made in pursuance of the power which Judge Ward has said they possess to change capital expenditures were paid by the City Company prior to the receivership and charged against the Metropolitan, make an amount of $234,483.81 for which the City Company has not been reimbursed, and which the petitioners concede should be retained out of the proceeds of the settlement apportioned. The total balance of indebtedness, theretofore, of $4,385,258.81 had at the date of the receivership been reduced by $3,036,000, leaving $1,349,258.81 as the unliquidated balance of that "certain other indebtedness" referred to in the recital, which the fund was intended in part to meet. The items of indebtedness of which this unliquidated balance is almost entirely composed will be identified by reference to paragraph 3 of the petition in the proceeding at bar as the $503,833 due on Central Crosstown notes paid by the Securities and Metropolitan Companies, as above noted, out of this $8,000,000 fund without the consent of the City Company, and refused by the court as a deduction for that reason, and $767,906 of special franchise taxes assessed against the Metropolitan and City Companies for a period prior to April 1, 1902, which it may be said in passing the City Company under the terms of the lease was not liable to pay.

As to the amount actually expended up to the time receivers were appointed for new construction on the First Avenue and Twenty-Eighth and Twenty-Ninth Street lines the petition in the last paragraph of its seventh article

alleges that the City Company supplied labor and materials for construction purposes on the Metropolitan system to the amount of $1,251,741.01, and had ordered materials for the same purposes for which claims were filed against the Metropolitan or City Companies which have been held provable against the City Company amounting to $234,880.49. The eighth article of the petition alleges it to be the duty of the City Company and its receivers to apply the proceeds of the action at law "to the purposes for which said moneys had been raised including reimbursement of the New York City Company for the amounts it had expended," and these purposes, summarized, are the payment of $1,386,224.01 for actual disbursements by the City Company prior to the receivership with $234,880.49 for obligations then incurred, but not paid, making $1,621,104.50 for expenditures made or incurred for the construction purposes contemplated at the making of the contracts of May, 1907, and the further payment of $2,563,956.50 for improvements and betterments upon the Metropolitan system not then contemplated, including new cars. These two items with the item for franchise taxes and accounts payable of $778,939 above mentioned make $4,964,000, the sum exclusive of interest for which judgment was given in the action at law.

These figures in these seventh and eighth articles of the petition are based upon certain findings of fact contained in the action at law, which were, in turn, based upon a stipulation between the parties to such action in terms made for its purposes. An examination of the record shows that such stipulation was made and the findings asked for in support of the second of the two not inconsistent theories upon which the action was based. The first treated the promise of the Securities Company in its contract with the City Company as evidencing an absolute obligation based on sufficient consideration to pay $8,000,000, and claimed the balance due of $4,964,000 without further proof. The second claimed in any event as an alternative measure of damages the actual disbursements made by the City Company for the purposes contemplated by its contract, including betterments and such disbursements for capital purposes made before and after the receivership with the existing items of Metropolitan indebtedness exhausted the balance due. The opinions of the Circuit Court and the Court of Appeals show that both theories were sustained, and that both courts hold that a recovery on either theory could be had. The disbursements after the receivership are for capital purposes not connected with the First Avenue and Twenty-Eighth and Twenty-Ninth Street lines, and, with reference to those, Judge Ward, having in mind that the then plaintiffs were receivers of both street railway companies, said that, "being disinterested officers of the court, they can under the direction of the court call as receivers of the City Company upon the defendant for the payment of the money, and apply it in accordance with the lease to such expenditures upon the property of the Metropolitan Company as they find are necessary and chargeable to capital account as distinguished from maintenance and operation. I find that they have done so with reasonable notice to the defendant." This view the Court of Appeal also adopts, and, apart from the question as to the effect on those not parties to the action at law of the findings of fact and conclusion of law as to the amount and nature of the capital disbursements specified in the findings, the law controlling the application of the moneys obtained under these May, 1907, contracts, made as they were to effectuate the lease, has, as it seems to me, been determined to be, not only that capital disbursements made or incurred for the betterments contemplated by the contracts on the First Avenue and the Twenty-Eighth and Twenty-Ninth Street lines are payable out of such moneys, but that the capital disbursements made by the receivers under the direction of the court are also. If, therefore, I were permitted to consider these findings of fact as to the amounts and nature of the disbursements for capital purposes before and after the receivership, it would appear that they are more than sufficient to exhaust the proceeds of the action at law as apportioned, and the answer to the question of the court would be simplified.

The petitioners and the replicant Trust Company, however, insist that, as they were not parties to the action at law, these findings of fact are not conclusive as to them, and that they are at liberty to show them to be otherwise. These findings with the petitioner's allegations that I have noted

constitute the only evidence in the record as to the amount and nature of the. capital expenditures, except that the parties have stipulated that between June 5 and September 23, 1907, the City Company expended various sums in excess of $5,000 and incurred obligations in excess of a like amount for purposes defined by the terms used in the lease for betterments on the First Avenue and Twenty-Eighth and Twenty-Ninth Street lines, and that it shall be determined whether the City receiver is entitled to retain from the proceeds of the action at law an amount equal to the aggregate of such expenditures and obligations; the determination of their amount as well as questions as to such receiver's right to credit for other or similar expenditures prior or subsequent to the receiverships being reserved. Testimony as to two concrete instances has been adduced showing an actual expenditure of $290.04 for rails used in the extension of a loop at Twenty-Third street and Thirteenth avenue in connection with the betterment on the Twenty-Eighth and Twenty-Ninth Street line between June 5 and September 23, 1907, and an obligation incurred, but not paid, for duct conduit on First avenue during the same period for $1,423.50 for electrification.

Coupled with the objection to the findings of fact as to the nature and amount of these capital expenditures is a motion to amend the petition which is opposed by all the replicants except the Trust Company. The motion is to omit from the petition that paragraph of the seventh article above referred to alleging expenditures by the City Company for capital purposes, and all of that portion of the eighth article showing the purposes for which these moneys had been intended, with the amounts applicable to each, thereby making the latter article so to read that it simply alleges that the duty of the City Company and its receivers respecting the balance recovered in the action at law is to hold the same for the benefit of such persons as shall be found entitled thereto. This motion was made during the progress of the hearings, and denied by me on the ground of lack of power. It was then made to the court before the hearings were finally closed, and the court denied it as unnecessary, saying that whether there was such a discrepancy between the proofs and these averments as to the amount of the balance of account between the City and Metropolitan estates as to require amendment could only be determined by the tribunal fully informed as to the proofs, which in the first instance is the master, and that whether or not he had the power to grant it the court has, and an exception to his refusal (if refused) would bring the matter before the Circuit Judge when the report comes up for confirmation who could then administer full relief.

Accordingly the motion has been renewed before me, and it is opposed by the replicants other than the Trust Company upon the ground, among others, that the findings of fact in the action at law are conclusive as to the matters embraced in those averments of the petition sought to be eliminated, and this, if so, would require a denial of the motion, as no evidence could change those facts as found and averred. I do not think, however, that they are conclusive. Neither the Trust Company nor petitioners· were ,parties to the action at law, and they surely should be permitted to show that such expenditures were not made, or, if made, what the amounts actually were. These findings as has been said are based upon a stipulation for the purposes of the action at law to which petitioners and the Trust Company did not agree, and which may set forth facts assumed for the purpose of determining one of the two questions litigated, without strict regard to what the expenditures, as to purpose and amount, actually were. The motion is coupled with the oral suggestion of counsel that the figures are not accurate. While, therefore, I am of the opinion that the burden will still be on the petitioners to show what part of the appropriated proceeds of the settlement are not needed to pay disbursements made or obligations incurred by the City Company or its receivers in fulfillment of its contract of May, 1907, as construed by the court, I am, nevertheless, in view of this suggestion of counsel, of the opinion that the motion should be granted by the court, and I shall so recommend.

Without, therefore, considering the facts alleged in the paragraphs of the petition now sought to be eliminated or in those findings of fact referred to on which they were based but only those suggested by the evidence as to

the two types and by the stipulation referred to, I shall find, as facts, that between June 5, 1907, and September 23, 1907, the City Company expended $290.04 for rails used in building a loop at Twenty-Third street and Thirteenth avenue in extension of the Twenty-Eighth and Twenty-Ninth Street line, and that it incurred an obligation during the same period which had not then been met for $1,423.50 for duct conduit used in the electrification of its First Avenue line, that during the same period it expended various sums in excess of $5,000 and incurred various obligations in excess of a like amount for similar purposes on the First Avenue and on the Twenty-Eighth and Twenty-Ninth Street lines; that such expenditures were made with the consent of the Metropolitan Company; and as conclusions of law that they constitute the capital expenditures contemplated by the lease for which the Metropolitan Company was obligated to issue its securities in accordance therewith and to meet which the City Company by its agreement with the Metropolitan of May 23, 1907, agreed to furnish $8,000,000 in cash, and that out of the proceeds of the settlement apportioned to the action at law the receiver of the City Company is entitled to retain an amount equal to such expenditures thus made and such obligations thus incurred during said period.

I shall accordingly suggest the following answer to the second question asked by the court: That the Metropolitan Street Railway Company or its receivers are entitled to that part only of the proceeds of said action at law which is not required by the receiver of New York City Railway Company to meet the capital expenditures made and the obligations incurred for such capital expenditures by it prior to September 24, 1907, upon the First Avenue and the Twenty-Eighth and Twenty-Ninth Street lines and for such further capital expenditures upon said lines and other lines or property of Metropolitan Street Railway Company as were made under the direction of the court by receivers of New York City Railway Company while acting as receivers of said Metropolitan Street Railway Company.

The third question asked is: Is the receiver of the New York City Railway Company entitled to use, and, if so, to what extent, four certain 5 per cent. improvement notes of Metropolitan Street Railway Company, of the face value of $1,000,000 each, and now in his possession, as a set-off or counterclaim in respect to the claim of Metropolitan Street Railway Company or its receivers to that part of the proceeds of the settlement apportioned to the action at law?

The four notes referred to in this question had been made and delivered by the Metropolitan Company to the Securities Company and by it to the Interborough in pursuance of the City-Metropolitan and Securities-Interborough contracts of May 22, 1907. They were each made payable to the Mercantile Trust Company or order. They were retained by the Interborough, and were not delivered by it to the Mercantile Trust Company with the four collateral improvement notes of the Metropolitan now outstanding in the hands of presumptively innocent holders, and they were in the possession of the Interborough at the date of settlement. The proposition of settlement made to the receiver of the City Company of June 27, 1910, and accepted with the court's approval, after proposing that neither the Securities Company nor the Interborough should participate directly or indirectly in the proceeds of the settlement or in any moneys that had or might come into the hands of the City or Metropolitan receiver, has this to say respecting the notes referred to:

"(3) That the Metropolitan Securities Company and the Interborough Metropolitan Company shall surrender to you, duly indorsed so as to transfer title, four certain improvement notes of the Metropolitan Street Railway Company each for $1,000,000 now in the hands of the Interborough Metropolitan Company, and shall assign, transfer, and set over to you any right, title, or interest that they or either of them may have in or to any claims which the Metropolitan Street Railway or its receivers now have or may hereafter have against any of the subsidiary companies, excepting only the four promissory notes, all dated April 30, 1907, and payable to the Mercantile Trust Company and now in the hands of that company, being the notes specified in paragraph 7 of the complaint in said action at law, no interest in which notes or in the claims represented thereby is intended to be transferred or

surrendered to you or to your company or to the Metropolitan Company or its receivers.

"(4) That the Metropolitan Securities Company and the Interborough Metropolitan Company shall assign, transfer, and set over to you (subject only to the pledge to the Mercantile Trust Company) any and all moneys to which they or either of them may become-entitled as holders or owners of equities in four other improvement notes of the Metropolitan Street Railway Company, each for $1,000,000 (now in the hands of the Mercantile Trust Company) from funds now or hereafter in your hands or in those of the receivers of the Metropolitan Street Railway Company, and that the Interborough Metropolitan Company and the Metropolitan Securities Company shall covenant for themselves and any subsequent holders that they will not demand or seek to recover from said receivers' funds any moneys on the said four notes of subsidiary companies held as collateral to the said improvement notes, and that, if any moneys are collected from said receivers' funds by the Mercantile Trust Company or any other holders on said improvement notes, an amount equal to the sum so collected shall be refunded forthwith by the Interborough Metropolitan Company to the receivers paying such moneys."

At the time of settlement the four notes in question were delivered to the City receiver unindorsed and as he insisted that they should be indorsed, the Mercantile Trust Company accordingly indorsed them without recourse, and they were redelivered to him. The notes themselves at the date of said delivery and redelivery had passed maturity. The terms of the settlement above stated were duly carried out by the execution and delivery of the appropriate agreements and releases.

I do not think that the contention of the petitioners that the notes were "surrendered" to the City receiver for the purpose of cancellation and delivery to the Metropolitan receivers can be accepted. Obviously such a contention means that, if the City Company or its receivers had advanced moneys for the purposes contemplated by its contract with the Metropolitan Company in excess of all payments from the Securities Company and these proceeds of settlement, the City receiver is required by the terms of the settlement to give up any claim that he may have against the Metropolitan estate for the balance of such advances for it is out of these very notes that both the lease and the contracts intended that reimbursement should be had. Unless the term "surrender" used have the somewhat far-fetched meaning attributed to it of surrender for cancellation, there is nothing in the terms of the settlement indicating that the City receiver was not to use the notes so far as might be needed to adjust the equities between the two estates, and I think that that is the real intention of the parties as these proposals disclose it. On the other hand, if the answer suggested to the second of the questions put by the court be correct, it becomes unnecessary to consider the contention of the City receiver that these notes constitute an equitable defense to, or that they are an equitable set-off or counterclaim against the claim of the petitioners to all of the proceeds of the action at law. What does seem clear is that to the extent of the difference, if any, between the advances by the City Company or its receivers for the purposes contemplated by the City-Metropolitan contract as construed by the court and the total payments to the City Company and its receiver, including the moneys attributable to the action at law on account of these $8,000,000 the City receiver is entitled to use an equivalent amount of these four improvement notes as evidencing a claim against the Metropolitan estate. I shall accordingly report to the court the following answer to its third question:

The receiver of New York City Railway Company is not entitled to use four certain 5 per cent. improvement notes of Metropolitan Street Railway Company of the face value of $1,000,000 each, now in his possession, as a set-off or counterclaim in respect to the claim of Metropolitan Street Railway Company to that part of the proceeds of the settlement apportioned to the action at law, but is entitled to retain and use them to the extent only that they represent a sum equivalent to the excess, if any, of the amount expended by New York City Railway Company and its receivers for the purposes contemplated by the contract of May 22, 1907, between New York City Railway Company and Metropolitan Street Railway Company, as construed by

the court, over the total payments, including said part of said proceeds of settlement so apportioned, on the $8,000,000 agreed to be paid to said New York City Railway Company by Metropolitan Securities Company under contract between them of the same date.

The replicant receiver will file with me and serve on the other parties to the proceeding on or before December 20, 1911, a proposed report in accordance with the foregoing. Proposed amendments to such report will be passed on at a hearing on December 27, 1911, at 2 p. m.

A supplemental report was filed February 5, 1912, as follows:

In the memorandum disposing of this matter, dated December 11, 1911, a typographical error occurred in the answer to question (a), consisting of the substitution of the word "plus" for the word "and." This has been corrected in the answer contained in the report. The reasoning which suggested the answer to the question (c) contained in the memorandum indicated clearly, I think, what the answer to that question was intended to be; but unfortunately the answer, as phrased, gave rise to a doubt as to whether, in my opinion, the notes referred to can be used as an offset or counterclaim, although I entertain no doubt that they cannot be. This difficulty has been solved, after full notice to all the parties, and at a hearing at which counsel duly appeared, by correcting the language of the answer suggested in such memorandum, so as to express precisely the disposition which, as it seems to me, should be made of the contentions respecting the use to which these notes can be put; and that answer, as thus corrected, appears in the report to be filed herewith.

Dexter, Osborn & Fleming (Theodore W. Morris, Jr., of counsel), for Receiver of New York City Ry. Co.

Masten & Nichols (William M. Chadbourne, of counsel), for Metropolitan St. Ry. Co.

Geller, Rolston & Horan (Bronson Winthrop and Charles T. Payne, of counsel), for Farmers' Loan & Trust Co.

Davies, Auerbach, Cornell & Barry (Brainard Tolles, of counsel), for Guaranty Trust Co.

J. Parker Kirlin, for Metropolitan St. Ry. Co.

Byrne & Cutcheon (James Byrne, of counsel), for Pennsylvania Steel Co. and another.

O'Brien, Boardman, Platt & Littleton, for Contract Creditors' Committee.

Charles Benner (Benjamin S. Catchings, of counsel), for Tort Creditors' Committee.

Richard Reid Rogers, for Interborough Metropolitan Co.

Alexander & Green, for Mercantile Trust Co.

Simpson, Thatcher & Bartlett (George N. Hamlin, of counsel), for Stockholders' Committee of Metropolitan St. Ry. Co.

LACOMBE, Circuit Judge. [1] The first question submitted to the special master was the apportionment of the lump sum paid by defendants in the two actions in compromise of the claims therein prosecuted. When negotiations for compromise were being discussed, the court instructed the receiver that no proposal would be accepted by which defendants should designate the distribution of what they paid. When the proposed adjustment was set down for hearing, it was expected that any party or person interested, who thought the proposal should be accepted only on the condition that the claim in which he was in-

terested should be paid in full, would indicate his position. But that was probably not plainly indicated, and the exceptants to the special master's report were quite correct in insisting that they were to be heard in this proceeding as to the basis of apportionment. Indeed, the order of approval expressly reserved that right. This contention was recognized, and all testimony which they offered has been taken and considered. In the absence of any persuasive proof to the contrary, a proportionate distribution is the correct rule—equality is equity. No evidence persuasive to a departure from this rule is found in the record. There is no force in the suggestion that the action at law had terminated in a judgment, made final by the adverse decision of all appeals from it, while the equity suit had only been submitted to the trial court on final hearing. All that could be obtained by execution under the judgment against the Metropolitan Securities Company had been collected. The judgment debtor had been squeezed dry, and the $1,000,000 which had been secured from it has been allotted by the special master in solido to the action at law, without any apportionment. No more was in sight, or in existence, except such as might be realized by ancillary proceedings instituted by the judgment creditor against stockholders of the judgment debtor. These had been initiated, but had not advanced as far as the equity suit had. In these proceedings as in the equity suit there were legal questions involved which made the result of both uncertain. As to the realization of the fruits of a profitable victory in the ancillary proceedings, there might also be some question. There was never any suggestion that a judgment in the equity action for the full amount claimed would not be paid in full. The last paragraph of the memorandum in 180 Fed. 514, indicates that a like assurance was not then felt as to the financial results of the other proceedings. We must go back and view the situation as it was at the time of the settlement, disregarding what improvement in financial conditions two years of good fortune may have brought about. Four millions of the money paid in compromise was, it is true, raised on notes of the principal stockholder of the defendant in the lawsuit, but the amount of those notes was advanced by defendants in the equity suit at par. Whether the same notes could have been sold at that price in the open market at that time is open to question. As to which proceeding it was which brought about the payment of this large sum, $5,500,000, and should therefore be credited with the accomplishment of the pleasing result, is a question not susceptible of proof. The writer who was advised of the negotiations for compromise, which went on for months, may have his individual opinion, but, if so, it is a mere guess, and nothing in this record affords more solid ground for a conclusion.

In the brief for the trustee under first mortgage, there is a suggestion of various things which might have happened had the trustee objected to the acceptance of the offer of compromise, unless the proceeds were so distributed that the interests represented in the action at law should be paid in full and the discount allowed on settlement should fall wholly upon the New York City Company. The suggestion omits the most probable result of such insistence at that time,

viz., a rejection of the proposal outright, leaving each interest to obtain what it could as a result of the prosecution to a finish of the independent litigations then pending. What would have happened had the pending proposal been rejected is entirely problematical, but it is a reasonable supposition that an offer would have been made to settle the equity suit for a sum in excess of $1,500,000, which defendants in that suit individually contributed to the payment actually made in settlement of both actions. Whether a sum large enough to induce a settlement of the equity suit would have been offered is mere guesswork. Whether upon rejection of the pending proposal any substantial offer would have been made by the Interborough-Metropolitan to settle the pending proceedings against stockholders of the Securities Company no one can now tell or could then foresee. Counsel who then represented that company as defendant in those proceedings certainly manifested confidence in their ability ultimately to defeat such proceedings. The whole situation as it existed at that time is so filled with unsolvable problems that the special master's distribution of the fund is approved as the only equitable solution.

It should be noted that out of the proceeds realized on the settlement of the action at law and the suit in equity the expenses of such realization, fees of attorneys and counsel and disbursements, should be deducted before there is any apportionment or distribution. But that is a matter which is of no practical significance, since the interest which has accrued on the fund while it has remained in the receiver's hands awaiting the termination of this proceeding to apportion will no doubt be sufficient to pay such expenses and leave, possibly, some balance of interest to be apportioned in the same ratio as the principal on which it has accrued.

[2] As to the second question: There is much force in the argument of counsel for the New York City Company receiver and for the complainant in the original creditor's bill, but the decision which the special master has reached touching the disposition to be made of the Metropolitan's distributive share of the proceeds of the compromise seems on the whole more equitable, and is approved. If in response to the demand of receivers made upon the Securities Company for the unpaid balance of the $8,000,000 that balance had been paid in cash, without litigation or delay, the court, irrespective of any finding that a technical "trust" had been created, would have instructed receivers to use none of it for operating expenses, but to expend every dollar in improvements of the sort contemplated when the $8,000,000 was provided for. There was delay, long delay, in payment of this balance, and during the interim receivers used money and property of the New York City Company in making these very improvements. What was thus expended should, as the special master finds, be returned to the New York City Company before its distributive share is turned over to the Metropolitan. This applies, not only to the expenditures on the First Avenue and on the Twenty-Eighth and Twenty-Ninth Street lines, but to all expenditures of like character made prior to receivership, as well as to those made subsequently by receiver.

In this connection reference may be made to a matter not discussed in the opinion. The receivers being without sufficient funds to make the necessary capital expenditures required to put the property in condition to render proper and efficient public service, $3,-500,000 was borrowed on receivers' certificates. The money thus raised was devoted exclusively to meeting expenditures of that character. So scrupulously were these instructions observed that there was an unexpended balance left at the close of receivership, which, of course, is properly applicable towards payment of the certificates. In view of the use to which the funds thus raised were to be put, this court thought the certificates should be made a lien on the property only of the Metropolitan. The Court of Appeals, however, held that the purchaser of the certificates should have a lien also on the property of the New York City Company. One of the items of its property was the cause of action to recover from the Securities Company the balance of money agreed to be paid by it, and which, had it been paid, would have made it unnecessary to borrow anything. It was logical and proper, therefore, to pledge this chose in action to secure the loan. But it seemed at the time to this court unnecessary and inequitable to pledge any other property of the City Company for that purpose. That opinion is still entertained, and it is understood that, by its decision, the Court of Appeals did not commit itself to the conclusion that, except to the extent of its realization on this chose in action, the City Company should be required ultimately to pay these certificates out of its own property. If the Court of Appeals on final hearing should concur with this court in the conclusion above expressed, the balance of Metropolitan's distributive share after repayment of the expenditures enumerated by the special master should be applied, so far as they go, to the payment of the first issue of receivers' certificates.

If, however, it should be finally held that property of the City Company, other than this particular chose in action, is to be applied to the payment of these certificates, then it will come to pass that the capital expenditures made from the proceeds of the certificates have really been made from the property of the City Company. Such expenditures will then come within the category of those already allowed by the special master (in the paragraph of opinion next preceding his discussion of the third question), and should be deducted from the distributive share of the Metropolitan.

The third and only remaining question is the disposition of the four $1,000,000 notes of the Metropolitan. Nothing is found in the record to sustain the proposition that they were turned over, properly indorsed to pass title, for the sole purpose of cancellation or destruction. The master's finding to the same effect is approved. If the arguments of the counsel for New York receiver and for the plaintiff in the creditors' bill convince the Court of Appeals, there will be no third question to answer. Taking the case as it now stands, as it is disposed of by what has been said supra in this opinion, the question as to their disposition is easily solved. Had the receiver offered them on the open market and had some one bought them, the cash

proceeds of that sale would be distributed in the same proportion as all other cash realized on the settlement. Not having been sold the notes should be distributed in the same ratio. This would leave one note to be split up, which could be done by indorsing receipt for payment of the proper proportional part.

As to the note or notes or fractional note remaining after distribution in the hands of the New York receiver, what is the status? That will depend upon what is the decision of the court of last resort touching the second question. If the decision of this court be affirmed, and if there shall be deducted from Metropolitan's distributive share all moneys paid by New York Company prior to receivership for capital expenditures (not already paid), and also all obligations incurred by New York Company for the same purposes and paid out of its estate, and all similar disbursements by its receiver out of its estate, the notes and fractions thereof which he holds will be without consideration and valueless as an offset. If, however, these expenditures are held not to be deductible from Metropolitan's share, and the burden of them falls entirely upon the estate of New York Company, then there will have moved to the Metropolitan a consideration sufficient to make the notes valid obligations. All Metropolitan interests were represented on the hearing upon the proposed compromise, and by not objecting practically consented to scaling down part of the stipulated consideration for present cash. Being valid obligations of the Metropolitan in New York City receivers' hands, they would then be available as an offset, to their face value, against the money, payable by him to Metropolitan as its distributive share of the proceeds of the compromise. Except as above indicated, the exceptions to special master's report are overruled, and the report confirmed.

In view of some suggestions contained in the brief of the Farmers' Loan & Trust Company, it must be remembered that, by reason of the circumstance that the numerous questions arising under these receiverships come up for determination in separate proceedings, inconsistencies sometimes appear, not only in the arguments of counsel, but also in the deliverancies of the court. For example, in this proceeding no attention is paid to the question when the lease terminated. The opinion proceeds on the assumption that capital disbursements made by receivers after October 1, 1907, were made by them as City Company receivers with City Company money. That assumption is apparently inconsistent with the opinion heretofore expressed that after that date the receivers were not operating the road under the lease. Until the Court of Appeals finally decides the one question, there can be no certain decision of the other. If this court's opinion as to the lease be sustained, then there will be no disbursements by receivers subsequent to October 1st to be deducted from Metropolitan's distributive share. In the place of such deduction, however, the New York City receiver would have a good claim against the Metropolitan's distributive fund for any money or property of its own which was used by Metropolitan receivers subsequent to October 1st.

It is of the utmost importance that this entire group of proceedings

be kept together, and argued at the same time before the appellate court. In no other way can a comprehensive and harmonious solution of these intricate problems be worked out.